1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAUL ALVAREZ, | **Case No. 1:16-cv-00203-AWI-JLT (PC)** |
| Plaintiff, | **FINDINGS AND RECOMMENDATION TO GRANT DEFENDANT'S MOTION FOR SUMMMARY JUDGMENT** |
| v. | |
| Dr. HASHEMI, | **(Doc. 45)** |
| Defendant. | **OBJECTIONS DUE WITHIN 14 DAYS** |

## I.    Procedural History

Plaintiff, Raul Alvarez, proceeds in this action on claims that Defendant, Dr. Nastran Hashemi, was deliberately indifferent to his serious medical needs. (Docs. 12, 18, 24.) Defendant contends that the level of care she provided to Plaintiff demonstrates that she was not deliberately indifferent to any of Plaintiff's medical conditions, entitling her to summary judgment. (Doc. 45.) On November 21, 2018, Plaintiff filed a memorandum of points and authorities in support of his opposition to Defendant's motion (Doc. 48) and a motion to extend time under Rule 56(d) to file a separate statement of disputed facts in opposition to motion for summary judgment (Doc. 49). Plaintiff was granted an extension of time to file a separate statement of disputed facts supported by Plaintiff's declaration (Doc. 52) and Defendant was granted the opportunity to file a reply (Doc. 54). However, despite lapse of the extension of time, Plaintiff did not file a separate statement of disputed facts or a declaration in opposition to

Defendant's motion for summary judgment. For the reasons discussed below, the Court finds that Defendant has established there is no genuine issue of material fact and her motion should be **GRANTED.**

II.    **Summary Judgment Standard**

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Washington Mutual Inc. v. U.S.*, 636 F.3d 1207, 1216 (9th Cir. 2011). An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987). The Court determines only whether there is a genuine issue for trial and in doing so, it must liberally construe Plaintiff's filings because he is a *pro se* prisoner. *Thomas v. Ponder*, 611 F3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

In addition, Rule 56 allows a court to grant summary adjudication, or partial summary judgment, when there is no genuine issue of material fact as to a particular claim or portion of that claim. Fed. R. Civ. P. 56(a); *see also Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim . . .") (internal quotation marks and citation omitted). The standards that apply on a motion for summary judgment and a motion for summary adjudication are the same. *See* Fed. R. Civ. P. 56 (a), (c); *Mora v. Chem-Tronics*, 16 F.Supp.2d 1192, 1200 (S.D. Cal. 1998).

Each party's position must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); *accord Simmons v. Navajo*

*County, Ariz.,* 609 F.3d 1011, 1017 (9th Cir. 2010).

Defendant does not bear the burden of proof at trial and, in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case. *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If Defendant meets her initial burden, the burden then shifts to Plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial." *Id.* This requires Plaintiff to "show more than the mere existence of a scintilla of evidence." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987).

In judging the evidence at the summary judgment stage, the Court may not make credibility determinations or weigh conflicting evidence, *Soremekun v. Thrifty Payless Inc.,* 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted), *cert. denied*, 132 S.Ct. 1566 (2012). Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).

### III. <u>Legal Standards Under the Eighth Amendment</u>

Prison officials violate the Eighth Amendment if they are "deliberate[ly] indifferen[t] to [a prisoner's] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "A medical need is serious if failure to treat it will result in "'significant injury or the unnecessary and wanton infliction of pain.'"" *Peralta v. Dillard*, 744 F.3d 1076, 1081-82 (2014) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir.2006) (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th

Cir.1992), overruled on other grounds by *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir.1997) (en banc)).

To maintain an Eighth Amendment claim based on medical care in prison, a plaintiff must first "show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Second, the plaintiff must show the defendants' response to the need was deliberately indifferent." *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (quoting *Jett*, 439 F.3d at 1096 (quotation marks omitted)).

As to the first prong, indications of a serious medical need "include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (citation and internal quotation marks omitted); *accord Wilhelm*, 680 F.3d at 1122; *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000).

As to the second prong, deliberate indifference is "a state of mind more blameworthy than negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (quoting *Whitley*, 475 U.S. at 319). Deliberate indifference is shown where a prison official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.*, at 847. In medical cases, this requires showing: (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. *Wilhelm*, 680 F.3d at 1122 (quoting *Jett*, 439 F.3d at 1096). "A prisoner need not show his harm was substantial; however, such would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs." *Jett*, 439 F.3d at 1096, citing *McGuckin*, 974 F.2d at 1060.

Deliberate indifference is a high legal standard. *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir.2004). "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person

'must also draw the inference.' " *Id.* at 1057 (quoting *Farmer*, 511 U.S. at 837). "'If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.'" *Id.* (quoting *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175, 1188 (9th Cir. 2002)).

To prevail on a deliberate-indifference claim, a plaintiff must also show that harm resulted from a defendant's wrongful conduct. *Wilhelm*, 680 F.3d at 1122; *see also Jett*, 439 F.3d at 1096; *Hallett v. Morgan*, 296 F.3d 732, 746 (9th Cir. 2002) (prisoner alleging deliberate indifference based on delay in treatment must show delay led to further injury).

## IV. **Analysis**

### A. **Defendant's Motion**

Defendant's evidence shows that Plaintiff is an inmate in the custody of the California Department of Corrections and Rehabilitation, incarcerated at the California Substance Abuse Treatment Facility (SATF) in Corcoran, California. (Defendant's Statement of Undisputed Material Facts No. 1 (UMF 1).)[1] Defendant is a physician licensed by the State of California and is board certified in Internal Medicine by the American Board of Internal Medicine. (UMF 2.) Since September 2012, Defendant has been employed by CDCR as a physician and surgeon at SATF. (UMF 3.)

As a physician and surgeon, Defendant's responsibilities include examination of patients, diagnosing their illnesses; prescribing medications and medical equipment; ordering various accommodations or "chronos" as described below; and administering medical treatment. (UMF 4.) She also provides pre- and post-operative care of surgical cases in accordance with the treatment plan and recommendations of the surgeon or specialist. (UMF 5.) Defendant was Plaintiff's primary care physician during a portion of his incarceration at SATF. (UMF 6.) Plaintiff suffers from history of bipolar disorder, chronic back pain from normal age-related disc degeneration, diabetes mellitus type 2, diabetic neuropathy, essential hypertension, history of ulcerative colitis, Barrett's esophagus, and hiatal hernia. (UMF 7.)

---

[1] Notably, Plaintiff did not dispute any of the facts set forth in Defendant's statement of facts.

**1.      Defendant's Care of Plaintiff's Ambulatory Conditions**

Plaintiff generally alleges Defendant refused to provide him a wheelchair and removed his accommodation for housing on a lower floor, which ultimately caused him to fall on the stairs. (Doc. 45-4, Exhibit A, p. 12-13.)  Plaintiff does not place the treatment of his diabetes at issue in this case.  Yet the record of Defendant's treatment of Plaintiff's diabetes demonstrates that she provided treatment of Plaintiff's symptoms of weakness and decreased sensation in his feet and legs caused from diabetic neuropathy, as well as decreased strength from normal age-related disc degeneration and nerve impingement.

Defendant's evidence shows, that pursuant Correctional Health Care Services policies and procedures, physicians employed by CDCR shall order accommodations for patients when medically necessary or to ensure equal access to prison services, programs or activities.  (UMF 32.)  Accommodations are generally made by providing an inmate patient a Comprehensive Accommodation Chrono.  (UMF 33.)  A chrono may provide for specific housing of an inmate, such as in a single cell or a ground or lower level floor cell, and/or may include use of medical supplies or equipment.  (UMF 34.)  A chrono may be designated "permanent" or "temporary" based on the individual patient's needs as determined by medical staff.  (UMF 35.)  A temporary chrono has an automatic expiration date which can be renewed.  (UMF 36.)  A permanent chrono is to be reviewed at least annually by a medical professional to determine its continued medical necessity.  (UMF 37.)  A permanent chrono indicates the inmate has a condition that is not expected to improve within six months, (UMF 38), and can removed or modified in accordance with the patient's medical necessity.  (UMF 39.)

Defendant's evidence also shows that, on October 30, 2013, Plaintiff complained of pain in his feet.  (UMF 42.)  Defendant noted Plaintiff's noncompliance issues with diabetic care on that date, (UMF 43), and her examination of Plaintiff's feet showed no signs of ulcers, edema, or change in sensation, and good peripheral pulses.  (UMF 44.)  Defendant increased Plaintiff's prescription for Metformin because of high hemoglobin levels, (UMF 45), and diagnosed neuropathy secondary to diabetes (UMF 46).  To treat Plaintiff's nerve pain Defendant discontinued Sulindac (NSAIDs) and prescribed naproxen and Trileptal.  (UMF 47.)  She also

ordered an eye exam, comprehensive metabolic panel blood tests, and urine lab tests to detect early signs of kidney damage associated with diabetic patients. (UMF 48-49.) Defendant provided Plaintiff information regarding the need for proper diet, exercise, and weight management to decrease symptoms of neuropathy. (UMF 50.)

On December 27, 2013, Defendant examined Plaintiff for complaints of pain in his right hip. (UMF 51.) She examined musculoskeletal strength tests by having Plaintiff lift and move his legs in various directions with resistance applied. (UMF 52.) Plaintiff had full strength, his reflexes were within normal limits, and he had no tenderness in the lumbar spine. (UMF 53.) Defendant diagnosed Plaintiff with lumbar radiculopathy, or chronic pain caused from disc compression or inflammation on the spinal nerve. (UMF 54.) She ordered x-rays of his right hip, which were taken on January 9, 2014 and showed no abnormalities. (UMF 57-58.) She continued prescription medication for pain management, (UMF 55), and continued to educate Plaintiff on the need for exercise (UMF 56).

On February 7, 2014, during follow up care for his diabetes, Defendant examined Plaintiff's extremities, including feet and ankles, for conditions associated with uncontrolled diabetes. (UMF 59.) Defendant continued Plaintiff's prescriptions for Trileptal and NSAIDs as needed to control his chronic pain symptoms, (UMF 60), and prescribed Lisinopril for high blood pressure to decrease the risk of complications due to damage of blood vessels and blood flow (UMF 61). Defendant increased Plaintiff's dosage for Metformin and continued to educate him on the need for daily exercise to help control his symptoms of pain and increase his strength. (UMF 62-63.)

On March 25, 2014, Defendant again examined Plaintiff who presented with complaints of increased bilateral foot pain and tingling sensations. (UMF 64.) She examined the strength levels in his extremities, which were all within normal limits, and noted improvement in his glucose levels. (UMF 65-66.) Defendant examined the sensation in Plaintiff's feet and ankles for diabetic damage and noted good peripheral pulse and no ulcers. (UMF 67.) She increased his daily prescription for Trileptal to help control his neuropathic pain and increased his dosage of Lisinopril. (UMF 68-69.)

Defendant again examined Plaintiff's strength levels on May 20, 2014, which were all within normal levels.  (UMF 70.)  She continued Plaintiff on NSAIDs and Trileptal.  (UMF 71.)  In the interim, Plaintiff was seen for gastrointestinal issues (see corresponding section herein).  As of August 28, 2014, Plaintiff was still refusing to control his diabetes with the use of insulin.  (UMF 72.)  Plaintiff offered no complaints of decreased ability to walk and exhibited no pain, discomfort, or imbalance while walking.  (UMF 73-74.)

Defendant examined Plaintiff on September 9, 2014, for a new complaint of acute low back pain.  (UMF 75.)  Prior to this examination, Plaintiff had been provided a temporary, loaner wheelchair by a custody officer who observed Plaintiff having difficulty walking.  (UMF 76.)  The wheelchair was not prescribed by a medical professional or based on any medical assessment.  (UMF 77.)  Defendant performed extremity and muscle strength tests which were within normal limits.  (UMF 78.)  Because of his acute pain, Defendant prescribed Plaintiff a short-term prescription of Tylenol #3 with codeine and provided him a temporary walker for two weeks.  (UMF 79-80.)  Defendant issued a temporary chrono providing Plaintiff with a ground floor cell and bottom bunk restriction through March 9, 2015 and a permanent back brace.  (UMF 81.)

On September 25, 2014, Defendant examined Plaintiff, following-up on his lower back pain.  (UMF 82.)  She reviewed his August 22, 2014 x-rays of his cervical, lumbar, and thoracic spine which were all unremarkable.  (UMF 83.)  She performed musculoskeletal tests finding full-strength in his extremities.  (UMF 87.)  She transitioned Plaintiff from the temporary walker to a cane.  (UMF 85.)  During this examination, Defendant determined that Plaintiff could walk using the cane without difficulty or discomfort -- after having Plaintiff walk for her using the cane insuring he was able to do so without difficulty or discomfort.  (UMF 86.)  Defendant prescribed Tylenol for Plaintiff when he completed the round of Tylenol #3. (UMF 84.)  Defendant increased Plaintiff's dosage of Trileptal for his diabetic neuropathy and referred Plaintiff to physical therapy to improve muscle strength.  (UMF 88-89.)

During her treatment of Plaintiff's leg weakness and back pain, Defendant never wanted Plaintiff to rely on a walker or wheelchair because, over a long period of time, use of such

assistive devices will result in greater weakness and atrophy of muscles from the lack of use. (UMF 90.)  Early mobilization and physical therapy is the standard of care based on clinical evidence to avoid muscle atrophy and permanent disability.  (UMF 91.)  It was in Plaintiff's best interest to use and develop his muscles as much as possible to promote healing and mobility, which Defendant explained to Plaintiff.  (UMF 91.)  Continued exercise increases stimulation and blood flow and lessens the symptoms associate with diabetic neuropathy and chronic back pain. (UMF 92.)

On October 9, 2014, Plaintiff reported that the course of Tylenol improved his back-pain levels; Defendant continued Plaintiff's use of a cane for another two weeks and referred him to physical therapy.  (UMF 93-94.)  However, on October 15, 2014, Plaintiff requested a chrono to restrict his prison job assignment and to provide him with a mobility vest.  (UMF 95.)  A mobility vest is provided to inmates to show others, including custody staff, that the inmate has difficulties with mobility and may not be able to perform certain physical functions that are required of other inmates.  (UMF 96.)  A work restriction chrono indicates the inmate has physical limitations and restricts the work an inmate is permitted to do while incarcerated, such as restricting rooftop work, climbing ladders, or lifting heavy items.  (UMF 97.)  During her examination on October 15, 2014, Defendant found Plaintiff to have full strength in all extremities, with no focal neurologic deficit (or abnormal or weaker functioning of muscles or nerves).  (UMF 98-99.)  He showed no discomfort during the office visit and was able to walk around the clinic without a cane, limping, or antalgic gait (abnormal stance indicating pain).  (UMF 100-101.)  Further, custody staff in the prison had reported to Defendant that Plaintiff was observed moving around without the use of any assistive devices.  (UMF 103.)  Based on the examination and observations, Defendant determined Plaintiff did not meet the requirements for a mobility vest or work restriction.  (UMF 104-105.)

Defendant followed up with Plaintiff again on October 30, 2014.  Plaintiff walked with a normal gait and had normal balance.  (UMF 106.)  There were no changes to his strength or ability to ambulate with use of a cane.  (UMF 107.)  She continued Plaintiff's medications and use of a cane while he completed physical therapy.  (UMF 108.)  Defendant also completed a

chrono providing Plaintiff with permanent ground floor cell and bottom bunk restriction, and temporary cane through February 1, 2015. (UMF 109. (The chrono mistakenly reads 2/1/2014, though it was prepared on 10/30/2014).) By November 27, 2014, Plaintiff had missed three consecutive morning dosages of Trileptal for neuropathic pain. (UMF 110.)

On December 3, 2014, examination of Plaintiff's musculoskeletal system and extremities showed full strength and Defendant observed him to have normal balance and a steady gait. (UMF 111-112.) On December 3, 2014, Plaintiff again refused Trileptal to manage his neuropathic pain. (UMF 113.) Defendant continued Plaintiff's use of a cane while he attended physical therapy. (UMF 114.)

On February 23, 2015, Plaintiff complained of difficulty walking. (UMF 115.) However, that morning Defendant observed him walking to receive his daily medications in the yard while carrying, rather than using, the prescribed cane. (UMF 116.) She reviewed x-rays of Plaintiff's cervical, thoracic, and lumbar spine, which were all unremarkable. (UMF 117.) She reviewed custody staff reports indicating that the patient had no problem walking while outside the clinic. (UMF 118.) She also reviewed the physical therapy progress notes which indicated Plaintiff's pain level was improving and that he was able to ambulate with a cane. (UMF 119.) She performed musculoskeletal and extremity strength tests, all were within the normal limits. (UMF 120.) Defendant continued Plaintiff's medications for diabetic neuropathy. (UMF 124.) Based on the x-rays, his performance with the physical therapist, and her observations and examination, Defendant determined Plaintiff no longer qualified for lower tier chrono. (UMF 121.) She removed the restriction for lower tier housing and ordered a temporary chrono for a lower bunk and continued the use of the cane. (UMF 122.) After the removal of the lower tier restriction, Plaintiff threatened Defendant, stating "Watch for me, I am around." (UMF 123.)

Plaintiff submitted a Health Care Services Request Form dated March 20, 2015, requesting a chrono for lower tier placement. (UMF 124.) Three days later, on March 23, 2015, Plaintiff meet with nurse Virginia Ignacio. When told of the removal of the lower tier choro Plaintiff threatened that he "will just fall off the stairs." (UMF 126.) The nurse noted that Plaintiff was able to ambulate with the use of a cane and had a steady gait, showing no signs of

weakness.  (UMF 127-129.)  Despite his complaints and continued counseling, by March 28, 2015, Plaintiff missed three consecutive days of taking his Trileptal prescription for neuropathic pain.  (UMF 130-131.)  Plaintiff later stated to a mental health provider, on April 2, 2016, that he hoped to fall so that he could hold Defendant responsible.  (UMF 132.)  Also evidencing his plan to feign an injury, Plaintiff wrote a letter to Defendant on April 5 indicating he would hold her responsible for any medical incidents.  (UMF 133.)

On April 12, 2015, Plaintiff was transported to Mercy Hospital in Bakersfield because of an alleged fall.  (UMF 134.)  There were no witnesses to the fall and Plaintiff could provide no details.  (135.)  All x-rays, CT Scans, echocardiogram, and a carotid Doppler ultrasound were unremarkable.  (UMF 136-137.)  There were no recommendations or referrals for surgery.  (UMF 144.) Upon his return to the prison, on April 14, 2015, Plaintiff was provided a temporary wheelchair and was prescribed Motrin and Robaxin for muscle spasms and pain.  (UMF 138.)  On April 17, 2015, Defendant followed up with Plaintiff, reviewing his records from Mercy Hospital and provided him a walker and orthopedic shoes.  (UMF 139.)  Plaintiff was able to use the walker without difficulties, pain, or facial grimacing and maintained his balance.  (UMF 140.)  He refused Robaxin and Trileptal for treatment of pain and muscle spasms.  (UMF 141.)  Defendant ordered physical therapy to increase Plaintiff's strength and updated his chrono including placement on a lower tier and lower bunk through June 30, 2015, as well as a work restriction. (UMF 142-143.)

On May 29, 2015, Defendant followed up with management of Plaintiff's back and leg pain.  (UMF 145.)  Defendant explained to Plaintiff that his pain caused by neuropathy and nerve impingement cannot be corrected fully and that it can only by complying with his medication regimen.  (UMF 146.)  During the examination, again Plaintiff threated to file a lawsuit against Defendant.  (UMF 148.)  Defendant updated Plaintiff's chrono to include a lifting restriction. (UMF 147) On June 10, 2015, Defendant updated Plaintiff's chrono to also include a work restriction.  (UMF 149.)

Despite Plaintiff's health care complaints, he continued to refuse medication for his diabetes and neuropathic pain for various periods of time throughout November of 2015.  (UMF

13, 72, 113, 141, 153-154.) More telling, however, Plaintiff was observed by custody staff on multiple occasions walking without his walker and without difficulty; this included one occasion in which he was observed standing on top of his cell's sink without support and jumping off the three-foot drop without any signs of pain or imbalance. (UMF 150-152, 155.) The day before Plaintiff filed this action, and days after he signed the complaint under penalty of perjury, an officer observed him walking without the use of his medically assigned walker. (UMF 156.) Defendant contends that the medical care and treatment she rendered to Plaintiff for his ambulatory and chronic pain issues was within the community standard of care. (UMF 157.)

Plaintiff asserts the claim for deliberate indifference to serious medical needs is demonstrated by the change in chrono removing the lower tier leading to the alleged fall. Defendant argues that Plaintiff, who has no medical training, merely disagrees with Defendant's considered medical decisions. Defendant contends that the record of Plaintiff's treatment leading up to the alleged fall in April 2015, including Defendant extensive progress notes of her examinations, observations, orders, and referrals demonstrate constitutionally adequate medical care. Defendant was not indifferent to Plaintiff's serious medical needs,[2] rather she diagnosed them. In late 2013, Defendant diagnosed Plaintiff with lumbar radiculopathy and diabetic neuropathy, the cause of Plaintiff's chronic pain syndrome. These are not curable conditions, but are managed with proper diet, strength and mobility exercises, control of diabetes, and pain medications.

The standard of care for treatment of Plaintiff's chronic pain syndrome and Plaintiff's alleged ambulatory disabilities, is the course of treatment pursued by Defendant as evidenced by the undisputed and thorough medical records. Following her diagnoses, for each examination of Plaintiff, Defendant recorded musculoskeletal and extremity strength tests, examined the legs and feet for signs of ulcers associated with decreased bilateral sensation and poor blood flow. She also referred Plaintiff four times to physical therapy to increase his strength, made outside

---

[2] For purposes of this motion only, Defendant concedes that Plaintiff's ambulatory needs are serious medical needs under the Eighth Amendment standard, although she does not waive her right to present evidence or argue otherwise if her motion is not granted.

referrals to specialists, targeted each of his associated conditions with medication, and continuously educated Plaintiff on the need for proper nutrition, exercise, and maintaining his medication prescriptions.

Defendant contends that her determinations regarding Plaintiff's medical requirement for lower tier cell placement and for ambulatory assistive devices also complied with the standard of care. Defendant's overarching goal for mobilization and physical therapy are based on clinical evidence to avoid muscle atrophy and permanent disability. Her decisions in September of 2014 to start Plaintiff with a walker and transition to a walking cane was intended to continuously develop Plaintiff's muscle strength to promote healing and mobility.

Defendant's decision to remove the Comprehensive Accommodation Chrono for lower tier placement on February 23, 2015 was the result of the consideration of numerous factors including her expertise and experience. The physical examinations including strength tests, review of physical therapist progress notes indicating improvement, review of recent x-rays of the spine which were unremarkable, his medical history, and observation by Defendant and custody officers of Plaintiff walking without the use of his cane, all support her determinations and demonstrate she properly treated Plaintiff.

Defendant correctly contends that the removal of his chrono for lower tier placement does not demonstrate deliberate indifference to his serious medical need. The evidence demonstrates that Defendant did not ignore Plaintiff's ambulatory complaints but actively worked to address them with the goal of improving his medical condition. She provided Plaintiff with chronos that addressed his ambulatory needs when it was clinically indicated. It was only upon demonstrated medical and physical improvements that the chrono was changed to remove lower tier housing. Hence, Defendant contends she did not act with deliberate indifference to Plaintiff's ambulatory medical condition.

A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the

inference.  *Farmer v. Brennan*, (1994) 511 U.S. 825, 837.  The question of whether Defendant

possessed the requisite subjective knowledge that harm would result from her orders is "subject to

demonstration in the usual ways, including inference from circumstantial evidence."  *Id.*, 511

U.S. at 842.  Defendant ordered a chrono for lower tier placement and mobility devices in

September 2014, prior to the alleged fall, and again subsequent to the fall in April 2015 -- which

Defendant correctly contends is evidence that she was not subjectively deliberately indifferent.

　　　　As described above Defendant did not change Plaintiff's chrono to remove the lower tier

on a whim or other bad motive; the decision was based upon a demonstrated improvement in his

ambulatory condition.  At no time did Defendant refuse or deny Plaintiff necessary medical

treatment, evaluation, or referrals to specialist.  (Decl. of Defendant ¶65.)  At no time did

Defendant intentionally or knowingly cause Plaintiff any injury or harm.  (*Id*.)  Defendant

correctly argues that, even if Defendant made medical error leading to the fall, a mere single

negligence act is insufficient to rise to the level of deliberate indifference of a serious medical

need.  *McGuckin v. Smith*, 974 F.2d 1050, 1060-61 (9th Cir. 1991) ("A finding that the

defendant's neglect of a prisoner's condition was an 'isolated occurrence,' *Wood v. Housewright*,

900 F.2d 1332, 1334 (9th Cir. 1990), or an 'isolated exception,' *Toussaint v. McCarthy*, 801 F.2d

1080, 1111 (9th Cir. 1986), to the defendant's overall treatment of the prisoner ordinarily militates

against a finding of deliberate indifference.").  As such, Defendant correctly contends that

reasonable inferences from the evidence do not support that Defendant had the requisite

subjective state of mind to support liability under the Eight Amendment.

　　　　　　　　**2.**　　　　**Defendant's Care of Plaintiff's Hiatal Hernia and Gastrointestinal Issues**

　　　　On August 15, 2014, Plaintiff was treated by a Physician's Assistant regarding his

complaints of weight loss and fecal blood.  (UMF 158.)　He was referred urgently for a

colonoscopy and esophagogastroduodenoscopy, to examine the lining of the upper

gastrointestinal tract, as well as referred to a nutritionist.  (UMF 159.)  The Physician's Assistant

also ordered a blood panel, lab tests, and x-rays (UMF 160) and added Amlodipine to help treat

his high blood pressure.  (161.)

On August 28, 2014, Defendant reviewed the results of Plaintiff's colonoscopy which showed a new diagnosis of ulcerative colitis of the rectum. (UMF 162.) Defendant prescribed Mesalamine to treat and prevent the symptoms of ulcerative colitis from recurring, as well as prednisone to reduce inflammation. (UMF 163-164.) Defendant then referred Plaintiff on September 11, 2014, to Mercy Hospital in Bakersfield for examination by a gastroenterologist. (UMF 165-166.) The results of the September 11, 2014 abdominal ultrasound showed a small renal cyst, but were otherwise negative. (UMF 167.)

Due to Plaintiff's continued weight loss and failure to thrive, Defendant again referred him to a gastroenterologist for an esophagogastroduodenoscopy on September 25, 2014, to rule out a tumor. (UMF 168.) On November 5, 2014, Plaintiff was transported to Mercy Hospital for the specialist referral. (UMF 169.) The esophagogastroduodenoscopy showed that Plaintiff had a hiatal hernia and a long segment Barrett's esophagus. (UMF 170.) A hiatal hernia occurs when part of the stomach pushes upward through the small opening (hiatus) through which the esophagus passes on its way to the stomach. (UMF 171.) In most cases, a small hiatal hernia does not cause problems and may be discovered only incidentally if the patient undergoes testing for a different condition. (UMF 172.) A large hiatal hernia can allow food and acid to back up into the esophagus, leading to heartburn. (UMF 173.) Barrett's esophagus is a complication of gastroesophageal reflux disease. (UMF 174.) One of the primary goals of treatment is to prevent or slow the development of Barrett's esophagus by treating and controlling acid reflux. (UMF 175.) This is done with lifestyle changes and medication (typically antacids). (UMF 175.) The Gastroenterologist's recommendation was to avoid spicy foods and repeat the endoscopy in two years. (UMF 176.) He did not recommend surgery. (UMF 177.)

On December 3, 2014, Defendant followed up with Plaintiff regarding his offsite esophagogastroduodenoscopy. She requested Proton pump inhibitors or PPI medication to reduce the production of acid and prescribed Sucralfate to treat Plaintiff's Barrett's esophagus and gastroesophageal reflux disease. (UMF 178-179.) Defendant's treatment of Plaintiff's diagnosis of ulcerative colitis, hiatal hernia, and Barrett's esophagus met the community standard of care. (UMF 180.)

Defendant contends she properly addressed Plaintiff's ongoing gastrointestinal issues with the same high level of care shown in her treatment of his chronic pain syndrome. For each complaint reported by Plaintiff or recognized by prison medical personnel, Plaintiff was referred to a specialist leading to new diagnoses including ulcerative colitis of the rectum, a hiatal hernia, and Barrett's esophagus. As to the latter two conditions, the specialist recommended only avoiding spicy foods, which Defendant correctly contends is insufficient to meet the standard for a serious medical need that significantly affects Plaintiff's daily living. *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992). There was no recommendation for surgery, Defendant wrote prescriptions to treat each of those diagnoses and to prevent their reoccurrence. Defendant correctly contends that the record of her follow up care and referrals belie any allegation that she was deliberately indifferent or had a subjective state of mind to support claim.

### 3. Defendant's Care of Plaintiff's Diabetes and Related Conditions

During Plaintiff's care, Defendant focused treatment on Plaintiff's primary diagnosis of diabetes and managing related conditions and complications. (UMF 8.) Diabetes is associated with long-term complications that can be disabling or life-threatening. (UMF. 9.) Diabetes affects many major organs, including the heart, blood vessels, nerves, eyes and kidneys. (UMF 10.) The disease dramatically increases the risk of various cardiovascular problems, including coronary artery disease with chest pain (angina), high blood pressure, diabetic neuropathy or nerve damage in extremities, skin and foot complications or infections, digestion complications, kidney damage, and serious vision conditions. (UMF 11.) As Plaintiff acknowledged, Defendant educated him about the importance of complying with treatment and medication regimens and advised him on numerous occasions to begin taking insulin. (UMF 12.) However, Plaintiff continuously declined to take insulin and routinely refused medication to treat his diabetic neuropathy. (UMF 13.)

Diabetic neuropathy is nerve damage caused by diabetes which leads to chronic pain (UMF 14) for which there is no known cure (UMF 15). Pain levels can be managed through combinations of over-the-counter pain medications, such as Tylenol, Aspirin, Ibuprofen or Naproxen, and anti-seizure medications, such as Oxcarbazepine or Trileptal. (UMF 16.) The use

of narcotics or opioids is not indicated for chronic pain associated with diabetic neuropathy (or chronic back pain) because of the potential side effects, risks, and increased tolerance over time. (UMF 17, 18.)  Management of diabetes and blood glucose levels to prevent further nerve damage is also essential for controlling pain, as well as exercise, including physical therapy. (UMF 18.)  In addition, high blood pressure combined with diabetes greatly increases the risk of complications because of damage to blood vessels and blood flow.  (UMF 19.)  Blood pressure medications can serve to reduce the possibility of further damage and increased pain.   (UMF 20.) The combination of these medications along with proper diet, exercise and control of blood sugar levels is the standard method for controlling neuropathy and symptomatic pain.  (UMF 21-22.)

Over the course of Defendant's treatment of Plaintiff, she examined and treated his diabetes and resulting chronic pain caused by diabetic neuropathy, and other associated conditions and complications, through a course of various medications.  (UMF 23.)  Defendant prescribed Lisinopril for high blood pressure, Simvastatin for high cholesterol, Spironolactone to treat or prevent hypokalemia (low potassium levels in the blood), Amlodipine, which dilates (widens) blood vessels and improves blood flow and is used to treat high blood pressure, Metformin and Glipizide for his diabetes, and anti-seizure medication Trileptal or Oxcarbazepine for his diabetic neuropathy.  (UMF 24-27.)  She also prescribed various combinations of Aspirin, Ibuprofen, Tylenol, Naproxen, and Tylenol with Codeine for pain relief (for neuropathy and chronic back pain) to be kept with Plaintiff in his cell and taken as needed.  (UMF 28.)

On each occasion Defendant treated Plaintiff, she examined his extremities including legs and feet for ulcers or skin breakdown, bruising, cuts, and discoloration.  (UMF 29.)  In addition to educating her patient on the importance of proper diet and exercise, Defendant also referred Plaintiff to physical therapy on at least four occasions to increase his strength, increase blood flow, and for management of his pain levels.  (UMF 30, 89, 94, 108, 142.)  Defendant's treatment of Plaintiff's diabetes and related conditions and complications met the community standard of care.  (UMF 31)

The Court finds that Defendant has met her burden to demonstrate the absence of a genuine issue of material fact regarding her care and treatment of Plaintiff's medical conditions.

*In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The burden therefore shifts to Plaintiff to establish that a genuine issue as to any material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

### B.  Plaintiff's Opposition

Initially, Plaintiff filed a motion seeking an extension of time to respond to Defendant's separate statement of undisputed facts.  (Doc. 49.)  Despite receiving the extension, (*see* Docs. 52), Plaintiff failed to submit a separate statement of disputed fact, evidence, or any arguments to address Defendant's motion for summary judgment on Plaintiff's claims under the Eighth Amendment.  Plaintiff thus fails to establish a genuine issue as to any material on his claims under the Eight Amendment and Defendant's motion for summary judgment thereon should be granted.  This is the only claim the Court found to be cognizable and the only claim which Plaintiff is proceeding.  (*See* Docs. 1, 12.)

Plaintiff also filed a terse opposition that ignored the substance of Defendant's motion on Plaintiff's claims under the Eighth Amendment and argued, because the motion failed to address the issues of negligence under California law and retaliation in violation of the First Amendment, that it should not be granted.  (Doc. 48.)  Yet, the Court did not find these claims to be cognizable (Doc. 12).  Even if construed as a motion for reconsideration, it is untimely and if it is construed as a motion to amend the complaint, it should be denied.  Finally, for the reasons discussed below, Defendant's evidence suffices to grant summary judgment on those claims as well.

### 1.  Reconsideration of the Screening Order

Plaintiff's opposition could be construed as seeking reconsideration of the order that screened the complaint and found it stated a cognizable claim under the Eighth Amendment only.  (Doc. 12, "the Cognizable Claim Order.")  That Court issued that order on April 29, 2016.  (*Id.*)

A motion to reconsider a magistrate judge's ruling is reviewed under the "clearly erroneous or contrary to law" standard set forth in 28 U.S.C. § 636(b)(1)(A) and Fed. R. Civ. P. 72(a).  As such, the court may only set aside those portions of a magistrate judge's orders that are either clearly erroneous or contrary to law.  Fed.R.Civ.P. 72(a); *see also Grimes v. City and*

*County of San Francisco*, 951 F.2d 236, 240 (9th Cir.1991) (non-dispositive pretrial orders are reviewed for clear error under Rule 72(a)).  Reconsideration motions are committed to the discretion of the trial court.  *Rodgers v. Watt,* 722 F.2d 456, 460 (9th Cir. 1983) (en banc); *Combs v. Nick Garin Trucking*, 825 F.2d 437, 441 (D.C. Cir. 1987).  However, objections to a magistrate judge's non-dispositive order must be filed within 14 days after service of the order on the objecting party. Fed.R.Civ.P. 72(a).  The result is no different if the Cognizable Claim Order is construed as dispositive, since the same 14-day deadline applies.  Fed.R.Civ.P. 72(b)(1).  Thus, since the Court issued the cognizable claim order on April 29, 2016, to be timely, Plaintiff would have had to file any motion for reconsideration on or before May 14, 2016.

However, the Court may extend some leniency on the filing deadline due to Plaintiff's disabilities.  Plaintiff requested appointment of counsel based on his low cognitive function, visual impairment and need for assistance in reading material and responding to any document he receives.  (Doc. 29.)  This request was granted and current counsel was appointed to represent Plaintiff on August 18, 2017.  (Doc. 30.)  Yet, even if the deadline to challenge the screening order were extended to 14 days after appointment of counsel, the deadline for reconsideration would have run on September 2, 2017 -- more than two years before Plaintiff's opposition was filed.  Further, even if reconsideration were timely, Plaintiff fails to demonstrate that the cognizable claim order was clearly erroneous or contrary to law.  Fed.R.Civ.P. 72(a).  Thus, any effort to obtain reconsideration of the cognizable claim order, should be denied.

### 2.  Amending Theories of Liability

Plaintiff may not now expand the scope of this litigation via opposition to Defendant's motion for summary judgment.  *See Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("[S]ummary judgment is not a procedural second chance to flesh out inadequate pleadings."); *see also Gilmore v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002)).  "A complaint guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations."  *Coleman v. Quaker Oats Co*., 232 F.3d 1271, 1292 (9th Cir. 2000).  "[A]dding a new theory of liability at the summary judgment stage would

prejudice the defendant who faces different burdens and defenses under [a] second theory of liability." *Id.* (citing *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 642 (3d Cir.1993)). Instead, "a plaintiff should have moved to amend his pleadings during discovery." *Id.*

The Court issued original Discovery and Scheduling Order on September 29, 2016. (Doc. 23.) The Court appointed Plaintiff counsel on August 31, 2017. (Doc. 31.) Subsequently, the Court modified the Discovery and Scheduling Order was twice: on September 27, 2017, after the parties' stipulated to extend the deadlines for discovery and dispositive motions (*see* Docs. 35, 36); and, on May 21, 2018, on Plaintiff's opposed motion (*see* Docs. 39, 42), which set September 1, 2018 as the final deadline for discovery and November 1, 2018 as the final deadline for filing dispositive motions (Doc. 42). Plaintiff's counsel had over a year from the time he was appointed until discovery closed to file a motion requesting leave to amend to plead theories of liability (negligence and retaliation), which were not identified in the cognizable claim order but did not do so. Plaintiff may not now add new theories of liability in opposition to Defendant's motion for summary judgment.

### 3. Summary Judgment on Medical Negligence & Retaliation Claims

Plaintiff also need not be allowed to proceed on medical negligence and retaliation claims as Defendant's evidence also meets her burden for summary judgment on any claims that Plaintiff might have for negligence and/or retaliation. The authority to grant summary judgment *sua sponte* was made explicit in the current version of Rule 56, effective as of December 2010. *Albino v. Baca*, 747 F.3d 1162, 1176-77 (9th Cir. 2014) (citing Fed.R.Civ.P. 56(f)). Further, the only reason the Court recommends granting summary judgment to Defendant on medical negligence and retaliation claims is because Plaintiff argues that he should be allowed to proceed on them. Plaintiff relied on these claims in his opposition, argued that Defendant had not met her burden of production for summary judgment thereon, and requested the Court deny summary judgment thereon. (Doc. 48, 2:11- 4:9.) Thus, since Plaintiff raised the issue, Plaintiff was on notice to come forward with all related evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986).

///

### a. Medical Negligence/Malpractice

"The elements of a medical malpractice claim are (1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and resulting injury; and (4) actual loss or damage resulting from the professional's negligence." *Avivi v. Centro Medico Urgente Medical Center*, 159 Cal.App.4th 463, 468, n. 2, (Ct.App. 2008) (internal quotations and citation omitted); *see also Johnson v. Superior Court*, 143 Cal.App.4th 297, 305, (2006).

Medical professionals are negligent if they fail to use the level of skill, knowledge, and care in diagnosis and treatment that other reasonably careful medical professional would use in the same or similar circumstances. This level of skill, knowledge, and care is sometimes referred to as "the standard of care" which can only be opined by medical professionals. *Landeros v. Flood*, 17 Cal.3d 399, 408 (1976); *see also Brown v. Colm*, 11 Cal.3d 639, 642–643 (1974); *Mann v. Cracchiolo*, (1985) 38 Cal.3d 18, 36; and Judicial Council of California Civil Jury Instruction 500, Summer 2008 Supplement Instruction.

Defendant submits evidence that meets her burden on summary judgment on any medical negligence/malpractice claim Plaintiff might raise based on her care and treatment of him. Defendant's evidence shows that Defendant's treatment of Plaintiff's diagnosis of ulcerative colitis, hiatal hernia, and Barrett's esophagus met the community standard of care. (UMF 180.) Defendant's evidence also shows that her treatment of Plaintiff's diabetes and related conditions and complications met the community standard of care. (UMF 31.) Her evidence shows that the medical care and treatment rendered to Plaintiff for his ambulatory and chronic pain issues by Defendant was within the community standard of care. (UMF 157.) As extensively noted above, prior to each of these statements of undisputed fact, Defendant's evidence provided detailed facts of Plaintiff's medical conditions, exam and testing results, as well as her plan for care and treatment for each of Plaintiff's medical issues. Defendant's evidence shows she did not breach the standard of care in her care and treatment of Plaintiff, which negates an essential element of Plaintiff's medical negligence/malpractice claim. *Nissan Fire & Marine Insurance Co. v. Fritz*

*Companies, Inc.* 210 F.3d 1099, 1102 (9th Cir. 2000).

The Court finds that Defendant has met her burden to demonstrate the absence of a genuine issue of material fact regarding whether her care and treatment of Plaintiff's medical conditions met the standard of care. *In re Oracle*, 627 F.3d at 387. The burden therefore shifts to Plaintiff to establish that a genuine issue as to any material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). However, though Plaintiff raised this theory in his argument opposing Defendant's motion, he failed to submit any evidence to show that Defendant breached the standard of care in her care and treatment of any of his medical conditions. (*See* Doc. 48.) Thus, Plaintiff has not met his burden of establishing a genuine dispute of material fact such to deny summary judgment on any claim under California law for medical negligence/malpractice against Defendant. Summary judgment should be granted to Defendant on this claim.

### b. Retaliation

The First Amendment protects inmates from retaliation for engaging in protected conduct. A retaliation claim has five elements. *Waitson v. Carter*, 668 F.3d 1108, 1114-1115 (9th Cir. 2012); *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir.2009).

First, the plaintiff must show that the retaliated-against conduct is protected. *Id.* The filing of an inmate grievance is protected conduct, *Rhodes v. Robinson*, 408 F.3d 559, 568 (9th Cir. 2005), as are the rights to speech or to petition the government, *Silva v. Di Vittorio*, 658 F.3d 1090, 1104 (9th Cir. 2011); *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985); *see also Valandingham v. Bojorquez*, 866 F.2d 1135 (9th Cir. 1989); *Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995). Second, the plaintiff must show the defendant took adverse action against the plaintiff. *Rhodes*, at 567. Third, there must be a causal connection between the adverse action and the protected conduct. *Waitson*, 668 F.3d at 1114. Fourth, the official must have engaged in "acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Robinson*, 408 F.3d at 568 (internal quotation marks and emphasis omitted). "[A] plaintiff who fails to allege a chilling effect may still state a claim if he alleges he suffered some other harm," *Brodheim*, 584 F.3d at 1269, that is "more than minimal," *Robinson*, 408 F.3d at 568

n.11. Fifth, the plaintiff must show "that the prison authorities' retaliatory action did not advance legitimate goals of the correctional institution. . . ." *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir.1985).

Plaintiff's only allegations that *could* be construed to state a retaliation claim pertain to his mobility issues. Plaintiff alleges that Defendant took away a wheelchair that correctional officers gave him to use and replaced it with a cane because Plaintiff had "602'd her." (Doc. 1, pp. 9-11.) When Plaintiff filed inmate appeals about this, Defendant allegedly removed his lower bunk chrono, which caused Plaintiff to fall one day while climbing the stairs. (*Id.*) Because of the fall, Plaintiff was taken to the hospital where he was given a walker on discharge. (*Id.*) After Plaintiff returned to the prison, Defendant allegedly took the walker away, but restored Plaintiff's lower-tier chrono. (*Id.*)

Defendant's evidence shows that she had medical justification for all decisions and orders for Plaintiff which negates the essential element of adverse action on any retaliation claim by Plaintiff. *Nissan Fire & Marine Insurance Co.*, 210 F.3d at 1102. To meet the adversity element of a retaliation claim, the allegedly adverse action need not be a full-fledged independent constitutional violation. *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). "[T]he mere threat of harm can be an adverse action . . ." *Brodheim*, 584 F.3d at 1270. However, not every allegedly adverse action supports a claim under section 1983 for retaliation.

In the prison context, cases in this circuit addressing First Amendment retaliation claims involve situations where action taken by the defendant was clearly adverse to the plaintiff. *See e.g. Rhodes*, 408 F.3d at 568 (arbitrary confiscation and destruction of property, initiation of a prison transfer, and assault); *Bruce v, Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003) (false validation as a gang member); *Hines v. Gomez*, 108 F.3d 265, 267(9th Cir. 1997) (issuance of false rules violation and subsequent finding of guilt); *Pratt*, 65 F.3d at 806 (prison transfer and double-cell status); *Valandingham*, 866 F.2d at 1138 (inmate labeled a snitch and approached by other inmates and threatened); *Rizzo*, 778 F.2d at 530-32 (reassignment out of vocational class coupled with transfer to a different prison). Defendant's evidence shows that none of her decision for Plaintiff's care and treatment suffice to meet the adverse action element of a retaliation claim.

Instead, Defendant's evidence shows that her decisions and directives for the care and treatment of Plaintiff's mobility issues were medically indicated and within the standard of care. (UMF 157.)

Also, Defendant's evidence shows she examined Plaintiff on September 9, 2014, for complaints acute low back pain for the first time. (UMF 75.) Before her examination, Plaintiff had been provided a temporary, loaner wheelchair by a custody officer who observed Plaintiff having difficulty walking. (UMF 76.) The wheelchair was not prescribed by a medical professional or based on any medical assessment. (UMF 77.) Defendant performed extremity and muscle strength tests which were within normal limits. (UMF 78.) Because of his acute pain, Defendant prescribed Plaintiff a short-term prescription of Tylenol #3 with codeine and provided him a temporary walker for two weeks. (UMF 79-80.) Defendant completed a temporary Comprehensive Accommodation Chrono providing Plaintiff with a ground floor cell and bottom bunk restriction through March 9, 2015, as well as a permanent back brace. (UMF 81.) This evidence shows that Defendant's removal of the wheelchair custody staff had given Plaintiff was not an adverse action since Plaintiff's condition was adequately addressed by medications, a ground floor cell and bottom bunk chrono, and a permanent back brace.

Though Plaintiff complained of difficulty walking on February 23, 2015 (UMF 115), that very morning Defendant observed him walking in the yard while carrying, rather than using, his prescribed cane. (UMF 116.) She also reviewed x-rays of Plaintiff's cervical, thoracic, and lumbar spine, which were all unremarkable. (UMF 117.) She reviewed custody staff reports indicating that Plaintiff had no problem walking while outside the clinic. (UMF 118.) Defendant also reviewed the physical therapy progress notes which indicated Plaintiff's pain level was improving, and that he was able to ambulate with a cane. (UMF 119.) Defendant performed musculoskeletal and extremity strength tests, all were within the normal limits. (UMF 120.) Defendant continued Plaintiff's medications for diabetic neuropathy. (UMF 124.) Based on the x-rays, his performance with the physical therapist, and her observations and examination, Defendant determined that Plaintiff was not qualified for lower tier chrono. (UMF 121.) She removed the restriction for lower tier housing and ordered a temporary chrono for lower bunk and

continued the use of the cane.  (UMF 122.)  This evidence suffices to establish that Defendant's removal of his lower bunk chrono, which allegedly caused Plaintiff to fall while climbing the stairs, was not an adverse action since Plaintiff's condition was supported by observations of Plaintiff walking without his cane and without difficulty, progress via physical therapy, normal extremity strength and examination results, and that Defendant ordered a temporary chrono for Plaintiff to have a lower bunk and continued use of a cane based on Plaintiff's medical condition.

Plaintiff's final allegation of retaliation asserts that when he returned from the hospital (after the alleged fall caused by Defendant's removal of his lower tier housing chrono), Defendant took away a walker Plaintiff had been given on discharge from the hospital.  Defendant's evidence shows that all x-rays, CT Scans, echocardiogram, and a carotid Doppler ultrasound performed at the hospital were unremarkable, (UMF 136-137), and Plaintiff was discharged without any recommendations or referrals for surgery, (UMF 144).  Upon his return to the prison, on April 14, 2015, Plaintiff was provided a temporary wheelchair and was prescribed Motrin and Robaxin for muscle spasms and pain.  (UMF 138.)  On April 17, 2015, Defendant followed up with Plaintiff, reviewing his records from Mercy Hospital and provided him a walker and orthopedic shoes.  (UMF 139.)  Plaintiff was able to use a walker without difficulties, pain, or facial grimacing and maintained his balance.  (UMF 140.)  He refused Robaxin and Trileptal for treatment of pain and muscle spasms.  (UMF 141.)  Defendant ordered physical therapy to increase his strength and updated his chrono including placement on a lower tier and lower bunk through June 30, 2015 and issued a work restriction.  (UMF 142-143.)  This evidence establishes that after he was discharged from the hospital, Defendant did not remove the walker (as alleged), but provided him a walker, which Plaintiff used without difficulty, and prescribed him orthopedic shoes, physical therapy, and provided him an updated chrono for lower tier and lower bunk placement and a work restriction.  Defendant's evidence shows that the actions she took after Plaintiff's discharge from the hospital were not adverse to Plaintiff.  Defendant's evidence shows an absence of a genuine issue of material fact regarding both whether her care and treatment of Plaintiff's medical conditions equated to adverse actions for Plaintiff's retaliation claim.  *In re Oracle*, 627 F.3d at 387.

In addition, Defendant's evidence shows that during her treatment of Plaintiff's leg weakness and back pain, she did not want Plaintiff to rely on a walker or wheelchair because, over a long period of time, they would result in greater weakness and atrophy of muscles from the lack of use. (UMF 90.) Early mobilization and physical therapy is the standard of care based on clinical evidence to avoid muscle atrophy and permanent disability. (UMF 91.) It was in Plaintiff's best interest to use and develop his muscles as much as possible to promote healing and mobility, which Defendant explained to Plaintiff. (UMF 91.) Continued exercise increases stimulation and blood flow, and lessening the symptoms associate with diabetic neuropathy and chronic back pain. (UMF 92.)

Defendant's overarching goal for mobilization and physical therapy are based on clinical evidence to avoid muscle atrophy and permanent disability. (Doc. 45-1, p. 20.) Defendant argues that her decisions in September of 2014 to start Plaintiff with a walker and transition to a walking cane were intended to continuously develop Plaintiff's muscle strength to promote healing and mobility. (*Id.*) Defendant's decision to remove the Comprehensive Accommodation Chrono for lower tier placement on February 23, 2015, was based on a culmination of factors including her expertise and experience. (*Id.*) The physical examinations including strength tests of Plaintiff, review of physical therapist progress notes indicating improvement, review of recent x-rays of the spine which were unremarkable, his medical history, and observation by Defendant and custody officers of Plaintiff walking without the use of his cane. (*Id.*)

Defendant correctly argues that the evidence demonstrates that she did not ignore Plaintiff's ambulatory complaints, but rather, actively worked to address such complaints, with the goal of improving Plaintiff's medical condition. (*Id.*) Defendant points out that she provided Plaintiff with chronos, which addressed his ambulatory needs when they were clinically indicated. (*Id.*) It was only upon demonstrated medical and physical improvements that she changed the chrono to remove the lower tier. (*Id.*)

Defendant's evidence shows an absence of a genuine issue of material fact regarding both whether she was motivated by retaliatory animus for a retaliation claim. *In re Oracle*, 627 F.3d at 387. Thus, Defendant's evidence meets her burden on summary judgment of any retaliation

claim Plaintiff might raise based on her care and treatment of him.

The Court finds that Defendant has met her burden to demonstrate the absence of a genuine issue of material fact regarding adverse actions and retaliatory motivation for Plaintiff's retaliation claim. *In re Oracle*, 627 F.3d at 387. The burden therefore shifts to Plaintiff to establish that a genuine issue as to any material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

Though Plaintiff did not submit any evidence in opposition to Defendant's motion, the Court considered his verified complaint as an affidavit. *Keenan v. Hall*, 83 F.3d 1083, 1090 n. 1 (9th Cir. 1996); *Schroeder v. MacDonald*, 55 F.3d 454, 460 n. 10 (9th Cir. 1995). However, Plaintiff's disagreement with Defendant's medical orders as expressed in the complaint (which took away the wheelchair custody staff gave him, removed Plaintiff's lower-bunk chrono, and removed the walker on his return to the prison from the hospital) do not suffice to show Defendant's actions were "adverse" to his medical condition. This is particularly so since Plaintiff is not medically trained (*see* Fed. R. Evd. 701, 702) and did not submit any medical evidence to show that Defendant's actions were adverse to Plaintiff's medical condition. He did not submit *any* evidence to counter Defendant's declarations showing her care and treatment of Plaintiff's various medical conditions were within the standard of care. Thus, Plaintiff has not met his burden to oppose Defendant's motion for summary judgment on any retaliation against Defendant. Summary judgment should be granted to Defendant on this claim.

Because Defendant is entitled to summary judgment on the merits of Plaintiff's claims, her argument for qualified immunity need not be considered.

## VI. Conclusions and Recommendations

As set forth herein, the Court finds that Defendant is entitled to judgment as a matter of law on Plaintiff's claims against her in this action. Accordingly, the Court **RECOMMENDS** that the Motion for Summary Judgment, filed by Defendant, Dr. Nastran Hashemi, on October 31, 2018 (Doc. 45), be **GRANTED** and this action should be dismissed.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). **Within 14**

**days** after being served with these Findings and Recommendations, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

    Dated:   **March 7, 2019**                       **/s/ Jennifer L. Thurston**
                                              UNITED STATES MAGISTRATE JUDGE